UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MYSTIC BLUE YACHT, LLC,

   Plaintiff,

v.

AB VOLVO PENTA and VOLVO PENTA
OF THE AMERICAS, LLC,

   Defendants.

_____/

## **COMPLAINT FOR DAMAGES**

   COMES NOW Plaintiff, Mystic Blue Yacht, LLC, by and through its undersigned counsel and pursuant to Rule 8 of the Federal Rules of Civil Procedure, and files this Complaint against Defendants, AB Volvo Penta and Volvo Penta of the Americas, LLC, and states as follows:

## **JURISDICTION, VENUE and PARTIES**

1. This action arises from the denial of warranty coverage by Defendants concerning the Volvo products on Plaintiff's motor yacht, named "Mystic Blue" (hereinafter, "Mystic Blue" or the "Vessel").

2. This is an action for damages in excess of $50,000.00 excluding attorney fees and costs and is within this Court's subject matter jurisdiction pursuant to the *Magnuson-Moss Warranty Act, 15 USC §2301 et al.* Alternatively and additionally, subject matter jurisdiction lies pursuant to *28 USC §1332*, as the parties and their respective members are in different states and/or countries and the amount in controversy exceeds $75,000.00 exclusive of interest, attorney fees and costs.

3.  Plaintiff is a Delaware limited liability company registered and authorized to do business in the State of Florida.  Tim and Lori Terry, husband and wife (the "Terrys" or the "Owners"), are the sole members of this LLC and are permanent residents of the State of New Jersey.  The Terrys are citizens of the State of New Jersey.   Therefore, Plaintiff is a citizen of the State of New Jersey.

4.  On information and belief, AB Volvo Penta is incorporated and has its principal place of business in Gothenburg, Sweden, and is a wholly owned subsidiary of the Volvo Group (aka AB Volvo), a publicly traded company listed on the Stockholm Stock Exchange.   AB Volvo Penta is therefore a citizen of the country of Sweden.

5.  Volvo Penta of the Americas, LLC is a Delaware limited liability company registered and authorized to do business in the State of Florida. On information and belief, Volvo Penta of the Americas, LLC has its headquarters/principal place of business in Chesapeake, Virginia. Volvo Penta of the America, LLC is therefore a citizen of the Commonwealth of Virgina.  On information and belief, Volvo Penta of the Americas, LLC is wholly owned directly or indirectly by AB Volvo Penta and ultimately, the Volvo Group.

6.  Venue is proper in the Southern District of Florida, West Palm Division, as at the time of this filing, the Vessel and the Volvo products on it are physically located at the Vessel's home marina in Palm Beach Gardens, Florida, and the written limited warranty at issue in this Complaint commenced upon the commissioning of the Volvo products at this same marina on January 10, 2023 by an authorized Volvo Penta Dealer.

7.  At all material times, Defendants and/or their affiliates, designed, assembled, manufactured, sold and otherwise placed into the stream of commerce marine engines and related equipment, systems and software which are integrated into fully assembled yachts, such as Mystic Blue.

8. At all material times, Defendants conducted business in the State of Florida directly and through its network of authorized dealers and servicers.

9. Defendants are subject to the personal jurisdiction of this Court because they, at all times material:

    a. Sold their products and issued and commissioned their product warranties to consumers (including Plaintiff) in the State of Florida;

    b. Operated, conducted, engaged in or carried on business ventures in the State of Florida for themselves and/or for their affiliates;

    c. Engaged in substantial and not isolated business activity within the State of Florida;

    d. Engaged in solicitation, advertising, marketing and/or services activities within the State of Florida;

    e. Produced materials, or things processed, serviced or manufactured that were delivered, used or consumed within the State of Florida in the ordinary course of commerce, trade or use;

    f. Caused injury to persons or property located in the State of Florida arising out of an act or omission outside the State of Florida;

    g. Entered into contracts with persons in Florida and produced or serviced products designed and specifically intended to enter the stream of commerce in the United States, and in particular, in the State of Florida; and

    h. Entered into contracts, including the limited warranty at issue in this case with Plaintiff, in the State of Florida.

10. Defendant AB VOLVO PENTA is a foreign business entity that engages in business in the State of Florida, without registering as a foreign business entity with the Division of Corporations as required by Florida Statute Chapter 607.1501.

11. Pursuant to Florida Statute Chapter 48.181, AB VOLVO PENTA, by failing to register as a foreign business entity with the Division of Corporations, is acting to conceal its whereabouts and is deemed to have appointed the Secretary of State as its agent on whom all process may be served, in any action or proceeding against it, or any combination thereof, arising out of any transaction or operation connected with or incidental to any business or business venture carried on in this state by such individual or foreign business entity.

**FACTUAL BACKGROUND**

12. Plaintiff owns Mystic Blue, a 2023 Sirena 58, length overall of 61 feet, with Hull ID number SSQ58063H223 and U.S. Coast Guard documentation number 1331664.

13. Mystic Blue was built in Turkey and sold and delivered to Plaintiff in the State of Florida. The vessel is documented by the United States Coast Guard ("USCG") as a foreign-built vessel with a "Recreation" endorsement.

14. Mystic Blue is equipped with two Volvo Penta D-11 670 hp engines (Port SN70112038445 and Starboard SN70112038450) (collectively, the "Volvo engines") and two Volvo helm control units (the "HCUs"). The Volvo engines, the HCUs and other Volvo parts, components, accessories and software (collectively, the "Volvo products") on board Mystic Blue were commissioned by an authorized Volvo Penta Dealer on January 10, 2023 (the "Commissioning Date") under Volvo's Marine Leisure Warranty. Up until the denied warranty claims at issue in this case, all prior warranty work on the Volvo products were processed, serviced and accepted by Volvo under the Marine Leisure Warranty.

15. Mystic Blue was outfitted by Plaintiff with a DockMate joystick control system shortly after taking delivery of the Vessel on or about November 10, 2022 (the "Delivery Date").  The DockMate is a handheld portable device that allows the operator to control the vessel without being positioned at a fixed helm station.   It is used primarily during docking and undocking procedures.

16. On or about December 19, 2019, Defendants issued a "Product Newsletter" dated December 19, 2021 and entitled "Interface for Dockmate and Yachtcontroller".  The Product Newsletter explains that Volvo added two supplier codes in the EVC system – one specifically for Dockmate – and that Dockmate will be able to buy interfaces to the EVC system. The interfaces provide Dockmate with "access to shift and limited throttle and they work together with EVC E and EVC 2 upgraded to the latest software."

17. The Product Newsletter states in a concluding "Note", "Dockmate has published a press release that their product is approved by Volvo Penta.  This is not correct, Volvo Penta has not approved neither one of those products and don't intend to do that either.  We sell them an interface but can and will not take any responsibility for the function of their product."  A copy of the Product Newsletter is attached as Exhibit "A".

18. The Volvo interface sold to DockMate by Defendants to connect the DockMate to the Vessel was ultimately paid for by Plaintiff as the costs of the DockMate installation, including parts and materials, were passed through to Plaintiff by DockMate.

19. The Terrys formed Mystic Blue Yacht, LLC as a business venture and acquired the Vessel through this entity as a business asset.  Plaintiff markets and charters Mystic Blue to others. All charters are done exclusively under bareboat charter agreements and only for the personal use and recreation of the charterers and their guests.

20. The Terrys also use the Vessel for their own personal use and recreation.

## WARRANTY

21. The Volvo products were commissioned on the Commissioning Date by an Authorized Volvo Penta Dealer under the Volvo Penta North America Limited Warranty Statement Marine Leisure, Publication # 47713693 dated January 2022 (hereinafter, the "Leisure Warranty"). A Copy of the Leisure Warranty is attached as Exhibit "B".

22. The Leisure Warranty contains the following statements and definitions:

   a. "The Warranty is offered by AB Volvo Penta to the owner or end user of the Product (herein, "Customer"). It is in addition to any rights the Customer may have under applicable mandatory law."

   b. "The Warranty applies only to leisure use. Leisure use means that the Product is only used for Customer's own personal use and recreation."

   c. "This Warranty does not apply to products in commercial use, including but not limited to revenue generation, passenger transport, cargo, transport, public sector/governmental service, rental, or charter e.g. paid crew, paying passenger, including multiple ownership interest or fractional ownership interest, and other uses which are not for the Customer's own personal use and recreation."

   d. "Products in commercial use are covered by the Volvo Penta North America Limited Warranty for marine commercial products, which is set out in a separate warranty statement."

   e. "A performance of a commissioning is a condition for the validity of this Warranty."

23. Under the Leisure Warranty, the warranty period for Major Components is 60 months and 4000 hours.

24. AB Volvo Penta also offers a Marine Commercial warranty for its products placed in marine commercial use.   The commercial warranty in effect at the time of Mystic Blue's commissioning was the Volvo Penta North America Limited Warranty Statement Marine Commercial, Publication # 47713692 dated November 2021 (hereinafter, the "Commercial Warranty").  A copy of the Commercial Warranty is attached as Exhibit "C".

25. The Commercial Warranty contains the following statements and definitions:

    a. "This Warranty only applies to products in Marine Commercial use.  Marine Commercial use means that the product is used for revenue generation, passenger transport, cargo, transport, public sector/governmental service, rental, or charter e.g. paid crew, paying passenger, including multiple ownership interest or fractional ownership interest, and other uses which are not for the Customer's own personal use and recreation."

    b. "Products, rating 5, in crafts designed for leisure use, used for charter or rental**"

    c. "**Charter / Rental: Paying passenger/ paid crew, including multiple ownership interest or fractional ownership".

26. Under the Commercial Warranty, the warranty period for D11 engine configurations in marine commercial use is either 12 months and 1000 hours or 12 months and 600 hours.

27. On information and belief, Volvo Penta of the Americas, LLC is responsible for the administration and processing of warranty claims for U.S. customers under the Marine Leisure Warranty and the Marine Commercial Warranty on behalf of AB Volvo Penta.   All

communications between Plaintiff and the Defendants concerning the Leisure Warranty were made through Volvo Penta of the Americas, LLC.

## **THE ENGINE PROBLEMS**

### Initial Engine Issues – October 2024

28. In October 2024, Mystic Blue experienced a starboard engine failure when the starboard engine shut down while underway due to a fuel pressure fault. Plaintiff retained Stewart and Stevenson ("S&S"), an authorized Volvo Penta Dealer, to evaluate the starboard engine. During its evaluation, S&S discovered metal shavings in the engine's fuel system and quickly concluded that the source of these metal shavings was most likely the fuel pump. S&S recommended replacing the fuel pump and fuel injectors on the starboard engine. Separately, while servicing the port engine, S&S found that metal shavings were also present in the port engine fuel system and recommended that the fuel pump and fuel injectors also be replaced on the port engine. These findings were submitted to Defendants by S&S under its normal warranty procedures.

29. A similar starboard engine failure occurred on or about November 2023. At that time, the fuel injectors and the charge air cooler were replaced by an Authorized Volvo Penta Dealer, but the root cause of the failure was not determined. This 2023 work was processed and covered by Defendants under the Leisure Warranty.

### HCU Issues

30. While S&S was working on the engine issues noted above, S&S relayed to the Plaintiff that the Volvo software onboard Mystic Blue had not been updated since the Commissioning Date and that software updates were available. S&S recommended updating the software and the Plaintiff agreed.

31. The software updates and programming were initially attempted by the S&S technician on

October 24, 2024.  The S&S technician's notes on the software programming efforts, dated

October 24, 2024, state [emphasis added]:

> Attempted to perform calibration updates on port and starboard drives, ECU,HCU1,HCU2 PCU,SUS, steering module & thruster module During calibration attempt the HCUs failed to be programmed and were corrupted. As a result of this the port and starboard engine ECUs were not able to be identified in the installations. Coupled with the HCU malfunctions this is preventing the vessel from gaining ignition function for both drive legs. I reached out to Volvo Penta direct and worked with the team to try and resolve this issue. This included Swapping HCUs from flybridge to main helm and attempting reprogramming in many different configurations with no success. ***It Was determined by Volvo Penta that the HCUs required replacement.*** One programmed HCU was sent from VP and another unprogrammed from our sister location. Returned to the vessel to install new HCU. Ignition power was gained as well as start /stop functionality. Connected to engines and the HCU needed to have the correct CSW software installed, upon this attempt the port side was again kicked out the system. We then proceeded with different configurations again to attempt reprogramming. We were successful in updating the PCU, steering and thruster modules for both legs and the ECU on STBD side. ***We removed power from the dock mate system thinking this could be affecting our programming. Reattempted with no success.*** Volvo Penta then Requested to send all 4 HCUs to them as well as the PORT ECU for bench programming and updates and they will ship them back to be installed. ***The cause of the programming issues while the components are installed is still unknown.*** Could there possibly be another 3rd party system on board corrupting the EVC system. Does SIRENA have a NON Volvo Penta supplied wiring schematic that they use to wire the VP system on this vessel. Including all 3rd party systems that are relating?

32. On October 25, 2024, Plaintiff received the following email message from S&S [emphasis added]:

> Just received an update from Volvo.
>
> The software from the mainframe that is to be uploaded into the HCU is currently not programmable ***and corrupted on the Volvo Sweden side***. They are working to rectify the issue, however this might mean that we don't have the HCU's back in time for Monday morning. I will keep you posted as they fill me in with info.

The good news is that the engine EMS was successfully programmed, *which confirms that the issues are isolated to the HCU's and the related software*.

Will keep you posted.

33. On October 31, 2024, Defendants rejected the HCU reprogramming as warranty work stating, "We found that the DockMate was/is causing the interference, not a Volvo Penta failure. Volvo Penta does not authorize DockMate products.  Since DockMate is the cause, this is not considered a warrantable failure."

34. Later that same day, Defendants reclassified the Vessel to fall under the Commercial Warranty instead of the Leisure Warranty due to Plaintiff's chartering of the Vessel.  This reclassification resulted in a denial of warranty coverage for all of the S&S work.

35. Some days later, the HCUs were successfully programmed by Volvo Sweden and returned and successfully installed on the Vessel by S&S.  The DockMate was then reinstalled and has functioned properly, without incident.

36. The cost of the S&S repairs for the Volvo engines and HCU software programming totaled $45,962.73, which Plaintiff was forced to pay due to Defendants' denial of the related warranty claims.

<u>Additional Engine Issues</u>

37. Upon completion of the S&S engine work, Mystic Blue departed from New Jersey for its winter home port in Palm Beach Gardens, Florida.  During the first days of this trip, the port engine developed a slow oil leak.   The source of the leak could not be detected while underway. While in port in Southport, North Carolina, Plaintiff retained Specialized Mechanical Services, Inc. ("SMS"), an authorized Volvo Penta Dealer, to evaluate the issues with the port engine.  SMS identified that the turbo shaft seals were leaking oil and oil was

flowing into the charge air cooler.  SMS found that the same issues were present in the starboard engine.  SMS recommended replacing the turbochargers on both engines as well as certain gaskets and seals.

38. When SMS tried to submit this engine work to Defendants for warranty coverage, SMS found that Defendants had reclassified the Vessel to be covered under the Commercial Warranty, and not the Leisure Warranty.  The SMS work therefore could not be submitted for warranty coverage under the Commercial Warranty because the warranty period under the Commercial Warranty had expired, although the work would have been covered under the Leisure Warranty.

39. Total cost of the SMS repairs was $16,940.74, which Plaintiff was forced to pay due to Defendants' denial of the related warranty claims.

Warranty Work Communications

40. While the S&S warranty claims were pending, the S&S technician working on the engines indicated to the Plaintiff that Defendants were reluctant to approve of S&S's proposed repairs (i.e., replacing the fuel pumps and fuel injectors) and instead were requesting that S&S continue to evaluate the engines.   Concerned about further delay in repairing the Vessel, Plaintiff reached out directly to Defendants to request that the work recommended by S&S, an Authorized Volvo Penta Dealer, be approved expeditiously.

41. The following email communications ensued between Plaintiff and Defendants:

    a.  On October 29, 2024 at 12:07 PM, Plaintiff wrote:

> I am the owner of Mystic Blue, a 2023 Sirena 58.  I currently have two Service Requests pending SR#1-18354969611 and SR#1-18354082691.  My boat has been stranded for more than a week awaiting Volvo approval of work and due to internal Volvo software issues.  The delays are unacceptable and are preventing me from relocating my boat to Florida for the winter.  Any further delays could lead to making the transit

trip in worsening weather conditions.  In addition, I continue to incur additional dockage costs and other costs (e.g., canceled charters) due to Volvo's delay.

Please expedite these matters immediately.  Every hour of delay is costly in terms of time, money and safety!

b.  On October 29, 2024 at 1:41 PM, Defendants wrote:

Thank you for reaching out to Volvo Penta Customer Relations.  I apologize that you are losing time with your Charter – are you able to advise the next Charter date so that I may advise our team?

We are expediting your case – here is an update.

Case: 1-18354082691 was submitted to Volvo Penta on 10/23/2024, below is the update:

Our team has already escalated your case.  Currently, we are looking into a couple of possibilities but are concerned with that Dock Mate might be causing issues.  We are still investigating.

Case: 1-18354969611 was submitted to Volvo Penta on 10/23/2023, below is the update:

We have responded to the dealer and are awaiting a response for additional diagnostics.

Engines.
70112038445

70112038450

c.  On October 29, 2024 at 2:44 PM, Plaintiff wrote:

Thanks for following up.  I need to be operational asap so I can get the boat to Florida.  Every day we are not there is a potential lost charter.  But, weather and holidays also now are starting to come into play.

Also, my understanding from the technicians here on the fuel system is they are waiting for authorization to replace the fuel pump and fuel injectors on starboard engine.  Please authorize this work asap.

d.  On October 29, 2024 at 3:03 PM, Defendants wrote:

Thank you, Tim, I have advised our team that you have upcoming Charters and asked that your cases be prioritized.

e.   On October 30, 2024 at 10:01 AM, Plaintiff wrote:

I need to get underway this weekend at the latest.   I don't understand why it's taking so long to get the HCUs and starboard engine issues resolved.

f.   On October 30, 2024 at 12:32 PM, Plaintiff wrote:

I would like to speak with someone knowledgeable about my pending service requests as soon as possible.

g.   On October 30, 2024 at 2:52 PM, Defendants wrote:

Thank you for your email.  I am in back to back meetings, but wanted to reach out to you via email as I understand you just called our Call Center. Are you able to kindly advise what questions you have?    This will allow me to send the technical questions to our Technical Manager for his response.  Thank you

h.   On October 30, 2024 at 2:55 PM, Defendants wrote:

Noting your email below advising you need this expedited – I will get with our team immediately –

i.   On October 30, 2024 at 3:01 PM, Plaintiff wrote:

Thank you.  I also want to make sure your team appreciates that this is the second year in a row, same time of year that the starboard engine has gone down.  Volvo should not minimize the fix, but should make sure that the repairs respond to all possible causes.  The local technician recommends replacing the fuel injectors and the fuel pump.  That is the minimum Volvo should do.  If Volvo thinks something else should also be replaced/addressed then that should be authorized as well.  I have literally incurred thousands of dollars of extra unexpected expenses because of these engine failures.  I should not have to go through this again!

j.   On October 30, 2024 at 3:47 PM, Plaintiff wrote:

I would also like a concrete timeline for the HCUs will be programmed and returned and the engine will be fixed.

k.   On October 30, 2024 at 3:56 PM, Defendants wrote:

The team will test the HCU's in the morning and if they work properly they will overnight.

l. On October 30, 2024 at 4:10 PM, Plaintiff wrote:

Thank you for the update.

m. On October 31, 2024 at 9:05 AM, Defendants wrote:

I hope you are well. I should have an update on the computers shortly and will send a separate email.

I wanted to provide you with an update regarding Charter usage and how it effects the warranty. Your vessel was initially registered under "Leisure" which does not seem to be correct per the policies attached. I have attached both the leisure and commercial policies for your review.

Throughout this week, I have forwarded your emails regarding expediting the repairs. The team noted in your emails that you stated the boat was used for Charters. The team also noted the high number of hours on the vessel, which is consistent with Charter usage.

We also noted the boat is registered under "Mystic Blue Yacht LLC". When this is googled, it takes you to a charter company showing the vessel for charters.

I have attached both the leisure and commercial policies for your review.

n. On October 31 2024 at 9:32 AM, Plaintiff wrote:

Mystic Blue is only chartered under the use of bareboat/demise charters and under U.S. law such use is not considered commercial use, it is leisure use. Each bareboat charter is a demise of the vessel with all warranties for the personal and recreational use of the charterer and charterers guests. In this capacity, the charterer steps into the shoes of the Customer for the period of the charter. The warranty contains no restrictions on transferability in this context. Consequently, all of our use of the boat has been "Customer" use and "Leisure" use and is covered by the Marine Leisure warranty.

For Volvo to take any other position would be inconsistent with U.S. law and upend the entire leisure boat community as many, many recreational boat owners charter their vessels to others under bareboat arrangements.

Please complete the warranty work asap.

o. On October 31, 2024 at 9:38 AM, Defendants wrote:

Thank you for the response.  I will send this to our legal team and Warranty Director to make a final determination on the vessel's warranty.

p.  On October 31, 2024 at 9:45 AM, Plaintiff wrote:

Thank you.   In the meantime, please give an update on the HCUs and engines.   The warranty question should not delay the work.

q.  On October 31, 2024 at 11:11 AM, Plaintiff wrote:

Please share the following email from US Coast Guard with your legal team as well.  Our charter agreements were reviewed by USCG legal and they confirmed that our documents created a valid bareboat charter.

Did the HCUs get tested this morning and are they functioning properly?

Thanks,
Tim

> From: Wolfe, Charles B CIV USCG SEC NEW YORK (USA) <Charles.B.Wolfe@uscg.mil>
> Sent: Thursday, June 8, 2023 1:24 PM
> To: Terry, Tim <Tim.Terry@HartzCapital.com>
> Subject: [EXTERNAL] RE: Mystic Blue
>
> Good Afternoon Tim,
>
> I just wanted to let you know that CG Legal was able to take a look at your documents and they agree with me that your agreements are legally sufficient. Their exact verbiage is as follows:
>
> "Good morning,
>
> Thanks for your patience, I wanted to ensure alignment with HQ entities on this. In summary, this agreement is sufficient to constitute as a bareboat charter agreement because it does not specify or provide the crew. Rather, it gives the charterer the option to pick crew."
>
> So as long as operate within your agreements, MYSTIC BLUE will be fine operating as a Bareboat Charter. I'll be sure they MYSTIC BLUE does not show up on the Lookout List for a priority boarding, all though you could still get boarded, but as long as you have these documents on board and the charterer can answer these questions you'll have no problems.
>
> Thanks for working with us to get ahead of any problems. Please reach out if you have any questions.

v/r,
Chuck

Chuck Wolfe
Assistant Senior Investigation Officer
U. S. Coast Guard
Sector New York
(w) 718-354-4298
(c ) 707-499-4396

r.   On October 31, 2024 at 11:52AM, Defendants wrote:

I have forwarded to our legal team for their review.

I should be hearing from our technical team soon on the HCU's and will advise.

s.   On October 31, 2024 at 12:08 PM, Defendants wrote:

We are sending the HCU's overnight, but they will still need to be tested.

I just spoke to our technician who called and provided a detailed update to Jeff this morning.  If you can kindly call Jeff to get the update as it's technical.

We found that the DockMate was/is causing the interference, not a Volvo Penta failure. Volvo Penta does not authorize DockMate products.  Since Dock Mate is the cause, this is not considered a warrantable failure.

t.   On October 31, 2024 at 1:31 PM, Plaintiff wrote:

You'll need to elevate the HCU warranty issue to legal as well.  Attached is the notice I found from Volvo on the topic.  It clearly states that Volvo is providing an interface to connect a Dockmate to the Volvo Penta system. While it says Volvo Penta has not "approved" the product (i.e., Dockmate), it does not say that plugging a Dockmate into the interface provided by Volvo voids the warranty.   It says Volvo "will not take any responsibility for the function of their [Dockmate] product."  It does not say that Volvo disclaims responsibility for the functioning of Volvo Penta parts/software etc. when the Dockmate is plugged into the interface. The Dockmate works fine and the HCU software issue has nothing to do with fixing anything on the Dockmate side.  The issue is on the Volvo software side of things.

It is one thing to clearly disclose to your customers that an aftermarket add-on may void a warranty – Volvo has not done this.   To claim now that the

warranty does not apply because I added-on a Dockmate for which Volvo provided (and announced to the world that it had done so) an interface for that specific purpose is specious, especially when Volvo, to my knowledge, has published no notice indicating that plugging a Dockmate into the Volvo interface actually voids the warranty.

I disagree with the conclusion that the warranty is voided or does not apply. I respectfully request that Volvo reconsider its position on this issue.

u.   On October 31, 2024 at 1:37 PM, Defendants wrote:

Thank you for your email.  I will meet with our team again on this and get back to you.  Thank you

v.   On October 31, 2024 at 1:42 PM, Defendants wrote:

Are you able to please advise which authorized dealer installed the Dockmate and the date of this occurred?

w.   On October 31, 2024 at 2:01 PM, Plaintiff wrote:

I worked directly with DockMate, purchased the system from them and used their installer to install the system.  I will confirm the install date tonight or tomorrow but I believe it was November 2022 soon after we closed on the boat.

x.   On October 31 at 3:19 PM, Defendants wrote:

Volvo Penta has determined the Charter usage on your vessel falls under the terms of the Commercial Warranty Policy.  Please note that the terms of the warranty including the definition of leisure and commercial use are prescribed by the warranty statement, and not any other definition including "U.S. law". The manufacture defines product usage with respect to warranty coverage. Your warranty policy is under commercial usage and is attached.

Please note you have remaining emissions warranty until 1/10/2028 or 5,000 hours, whichever comes first.

Potentially, some of the fuel system issues could be included under the emission warranty.  However, the authorized dealer will need to determine the root cause before this work can be considered for warranty.  You will need to authorize any work on the fuel system as the root cause has not been identified for warranty to be considered.  The failure was also have to be considered a warrantable failure.

Our team will continue to work with your authorized dealer to provide support to resolve the HCU issues.  At this point, we are working with your dealer to identify the Dockmate installation.  We have an Engineer involved that specializes in HCU's and he is providing guidance.

y.   On October 31, 2024 at 4:24 PM, Plaintiff wrote:

I can't imagine that Volvo is suggesting that the warranty is covered by "Volvo law".   Utterly ridiculous.   I can't imagine that any law other than U.S. law applies to a U.S. customer when not otherwise specified.  Irrespective of that issue, the warranty language itself demonstrates that Volvo's latest interpretation is also incorrect.  The warranty states, "This Warranty does not apply to products in commercial use, including, but not limited to . . . charter, e.g., paid crew, paying passenger . . . ."   Those descriptive words, i.e., "paid crew, paying passenger" are used when describing crewed charters, passenger vessels or charters for hire which are commercial charters.  They are not used to describe bareboat charters.  So, by the warranty's own descriptive language, bareboat charters are excluded from the warranty's definition of  both "charter" and "commercial use".  The distinctions/descriptions/differences between bareboat charters and commercial charters are commonly held and well understood across legal jurisdictions and are well engrained in centuries of international admiralty law as reinforced by U.S. law.  So under any governing law Volvo may argue that applies, other than "Volvo law", the warranty language itself acknowledges and reinforces the distinction between the two.  Our bareboat charters are recreational use not commercial use under the express terms of the Warranty.

I do not accept Volvo's determination of the Warranty coverage as it is simply incorrect.  I appreciate that Volvo is continuing to work to solve the HCU and engine issues and I expect Volvo to continue to do so on an expedited basis.

I will continue to insist that the work be covered by Volvo as it is Volvo's obligation under the warranty.  Finally, when Volvo suggests that no law governs the warranty other than Volvo's self-serving interpretation thereof, aka "Volvo law", it makes me question Volvo's judgement and motivations and gives the appearance of bad faith.  I hope that it is not the case.

z.   On November 18, 2024 at 10:45 AM, Defendants wrote:

I just received your voicemail.  Our team determined this vessel is used for commercial usage, please refer to my email below.  You are welcome to email me back with any questions.  Thank you

aa. On November 18, 2024 at 11:25 AM, Plaintiff wrote:

Would you please send me the Leisure and Commercial warranties that were in effect on the date Volvo commissioned the engines, i.e., 1/9/2023? The two warranties you provided previously are dated July 2023 (Marine Leisure) and September 2023 (Marine Commercial).

bb. On November 19, 2024 at 9:31 AM, Defendants wrote:

As requested, please see the attached.  Thank you

42. All conditions precedent to Plaintiff's claims against the Defendants have occurred or have been waived by the Defendants.

## COUNT I
## VIOLATION OF MAGNUSON-MOSS WARRANTY ACT
## SECTION 2302(a)

43. Plaintiff re-alleges paragraphs 1 through 42 above as if fully set forth herein.

44. The Volvo products are "consumer products" within the meaning of the *Magnuson-Moss Warranty Act, 15 U.S.C. §2301, et seq.* (hereinafter, the "MMWA").   Under Section 2301(1) of the MMWA, each of the Volvo products constitutes "tangible personal property which is distributed in commerce and which is normally used for personal, family or household purposes". According to the U.S. Federal Trade Commission, the "applicability of the Act to a particular product does *not,* however, depend upon how an individual buyer will use it."   (See Businessperson's Guide to Federal Warranty Law; https://www.ftc.gov/business-guidance/resources/businesspersons-guide-federal-warranty-law.)

45. At all times material hereto, the Vessel was a leisure yacht designed for recreational use and its documentation with the U.S. Coast Guard contains a "Recreation" endorsement.  The U.S. Coast Guard documentation does not contain a "Coastwise Trade" endorsement which is required to engage in commercial activities in U.S. waters (see 46 CFR § 67.19(a)).

46. At all times material hereto, the Volvo products were affixed to the Vessel and were intended to be sold and distributed with the Vessel for, as the Leisure Warranty states, "the Customer's own

personal use and recreation." The term "Customer" is defined as "the owner or end user of a Product".

47. The Leisure Warranty was prepared and published by Defendants intending it to cover the Volvo products upon the sale of the Vessel to Plaintiff. The Vessel and the Volvo products were commissioned on the Commissioning Date under the Leisure Warranty by an Authorized Volvo Penta Dealer.

48. At all times material hereto, Plaintiff is a "consumer" within the meaning of MMWA Section 2301(3) as Plaintiff was the buyer (other than for purposes of resale) of the Volvo products. Plaintiff acquired the Vessel and the Volvo products for the specific purpose of being used by the owners of Plaintiff (i.e., the Terrys) and by end users (i.e., bareboat charterers) in each case for their personal use and recreation. Plaintiff did not acquire the Vessel or the Volvo products for resale or commercial purposes.

49. At all times material hereto, Plaintiff is a "consumer" within the meaning of MMWA Section 2301(3) as Plaintiff is the "owner" of the Volvo products and is therefore entitled to enforce the Leisure Warranty against Defendants by the terms of the Leisure Warranty. The Leisure Warranty states, "The Warranty is offered by AB Volvo Penta to the owner or end user of the Product (herein, "Customer"). It is in addition to any rights the Customer may have under applicable mandatory law."

50. At all times material hereto, Defendants were a "warrantor" as defined under MMWA Section 2301(5) as the Leisure Warranty constitutes a "written warranty" as defined under MMWA Section 2301(6) and the Leisure Warranty formed part of the basis on which Plaintiff agreed to purchase both the Vessel and the Volvo products.

51. On October 31, 2024, at 9:05 AM, Defendants first informed Plaintiff that they considered the

Vessel to be covered by the Commercial Warranty rather than the Leisure Warranty. "Your vessel was initially registered under "Leisure" which does not seem to be correct per the policies attached." "Throughout this week, I have forwarded your emails regarding expediting the repairs. The team noted in your emails that you stated the boat was used for Charters. The team also noted the high number of hours on the vessel, which is consistent with Charter usage. We also noted the boat is registered under "Mystic Blue Yacht LLC". When this is googled, it takes you to a charter company showing the vessel for charters."

52. Plaintiff responded to Defendants' email by clarifying that Plaintiff's charters were bareboat charters and thus a "recreational" use not a "commercial" use under U.S. law, "Mystic Blue is only chartered under the use of bareboat/demise charters and under U.S. law such use is not considered commercial use, it is leisure use. Each bareboat charter is a demise of the vessel with all warranties for the personal and recreational use of the charterer and charterers guests. In this capacity, the charterer steps into the shoes of the Customer for the period of the charter. The warranty contains no restrictions on transferability in this context. Consequently, all of our use of the boat has been "Customer" use and "Leisure" use and is covered by the Marine Leisure warranty. For Volvo to take any other position would be inconsistent with U.S. law and upend the entire leisure boat community as many, many recreational boat owners charter their vessels to others under bareboat arrangements."

53. Plaintiff further responded by providing support that its charters were bareboat charters, forwarding an email from the U.S. Coast Guard confirming that Plaintiff's charter documentation created valid bareboat charters. The U.S. Coast Guard email stated,

> I just wanted to let you know that CG Legal was able to take a look at your documents and they agree with me that your agreements are legally sufficient. Their exact verbiage is as follows:

"Good morning,

Thanks for your patience, I wanted to ensure alignment with HQ entities on this. In summary, this agreement is sufficient to constitute as a bareboat charter agreement because it does not specify or provide the crew. Rather, it gives the charterer the option to pick crew.

So as long as operate within your agreements, MYSTIC BLUE will be fine operating as a Bareboat Charter. I'll be sure they MYSTIC BLUE does not show up on the Lookout List for a priority boarding, all though you could still get boarded, but as long as you have these documents on board and the charterer can answer these questions you'll have no problems."

Thanks for working with us to get ahead of any problems. Please reach out if you have any questions.

54. Plaintiff provided evidence directly to Defendants that its charters were bareboat charters and, therefore, a "leisure use" under the Leisure Warranty which "means that the Product is only used for Customer's own personal use and recreation."   The term "Customer" is defined as "the owner or end user of a Product".  A common understanding of "owner" in this instance would include the Terrys.  A common understanding of "end user" would include the Vessel's bareboat charterers.

55. U.S. law is also clear on this point, a "'recreational vessel' means a vessel- (A) being manufactured or operated primarily for pleasure; or (B) leased, rented, or chartered to another for the latter's pleasure." (See 46 U.S. Code § 2101(34)). "A recreational endorsement entitles a vessel to pleasure use only" (see 46 CFR § 67.23(a)).  Further, the "Note" included at the end of 46 CFR § 67.23 states, "A vessel having a Certificate of Documentation endorsed only for recreation may be bareboat chartered only for recreational use."   The U.S. Coast Guard enforces compliance with these regulations.

56. Mystic Blue has a Certificate of Documentation endorsed only for recreation.  The Vessel is chartered to others under bareboat charter agreements only for recreational use of the charterer.  Plaintiff's bareboat charter agreements have been validated by the U.S. Coast Guard.  A Coast Guard Guidance memorandum describing the legal requirements for a valid recreational bareboat charter is attached hereto as Exhibit "D".

57. The fact that Plaintiff is a business entity, has a website and actively markets Mystic Blue for charter is irrelevant to the analysis of "leisure use" under the Leisure Warranty.  The Leisure Warranty by its terms is based on actual product usage not owner motivations or what happens when the Volvo engines are not running.

58. The Leisure Warranty expressly applies to "leisure use" of the Product meaning "the Customer's own personal use and recreation".  When the Volvo engines are running, the Vessel is being used either for the owner's personal use and recreation or the bareboat charterer's (i.e., end user's) personal use and recreation.  Both are a "Customer" under the express terms of the Leisure Warranty.  Mystic Blue is and has been used only for "leisure use" by design, by registration, by contract, by actual use and by law.  Plaintiff's Volvo product usage therefore falls squarely within the express language of the Leisure Warranty.

59. Despite all evidence to the contrary, Defendants nonetheless responded by unilaterally reclassifying the Vessel to fall under the Commercial Warranty without any justification.  In doing so, Defendants stated,

> Volvo Penta has determined the Charter usage on your vessel falls under
> the terms of the Commercial Warranty Policy.  Please note that the terms
> of the warranty including the definition of leisure and commercial use are
> prescribed by the warranty statement, and not any other definition including
> "U.S. law". The manufacture defines product usage with respect to warranty
> coverage. Your warranty policy is under commercial usage and is attached.

60. In reclassifying the Vessel to fall under the Commercial Warranty, Defendants have ascribed

proprietary and undisclosed meanings (collectively, the "Secret Volvo Meanings") to the express terms used in the Leisure Warranty.  These Secret Volvo Meanings sprang to life solely to deny Plaintiff's warranty claims.   The Secret Volvo Meanings are contrary not only to the plain meaning and common understanding of the Leisure Warranty's express terms, but they are also contrary to U.S. Law.  Defendant's administration and interpretation of the Leisure Warranty, including the Secret Volvo Meanings, therefore cause the Leisure Warranty to be a "deceptive warranty" under MMWA Section 2310(c)(2) in violation of MMWA Section 2302(a) which requires a warrantor to "disclose in simple and readily understood language the terms and conditions of such warranty."

61. By denying Plaintiff's warranty claims utilizing deceptive warranty practices in violation of the MMWA, Defendants have caused Plaintiff to sustain damages equal to $62,903.47 representing the actual costs to repair the Volvo products that would have been covered by the Leisure Warranty if U.S. law and the common understanding of terms and conditions of the Leisure Warranty were applied by Defendants rather than the Secret Volvo Meanings.

62. At all times material hereto, Defendants drafted, adopted and issued the Leisure Warranty to specifically comply with the MMWA and U.S. law and Defendants, the legal team and the Warranty Director either knew or should have known that the Leisure Warranty was governed by U.S. law and the MMWA and that the use of both the Vessel and the Volvo products were governed by U.S. maritime law.

63. At all times material hereto, Defendants, the legal team and the Warranty Director knew or should have known that the Leisure Warranty was drafted expressly and purposely to allow leisure boat owners to enter into recreational bareboat charters and that such use would be deemed to be "leisure use" under the Leisure Warranty and U.S. law because (i) such use was

for a "Customer's own personal use and recreation" as the Leisure Warranty states, (ii) "Customer" is defined as "the owner or end user of the Product" under the Leisure Warranty, and (iii) under U.S. maritime law, "'recreational vessel' means a vessel- (A) being manufactured or operated primarily for pleasure; or (B) leased, rented, or chartered to another for the latter's pleasure." (See 46 U.S. Code § 2101(34)).

64. At all times material hereto, Defendants, the legal team and the Warranty Director purposefully, deliberately and deceptively misrepresented the terms and meanings of the Leisure Warranty with the specific intent to (i) avoid financial liability under the Leisure Warranty without reasonable justification; (ii) deny Plaintiff's rights under the Leisure Warranty and (iii) oppress, frustrate and harm Plaintiff.

65. At all times material hereto, Defendants, the legal team and the Warranty Director purposefully, deliberately and deceptively denied the applicability of U.S. law to the Leisure Warranty and to Plaintiff's rights thereunder to . i) avoid financial liability under the Leisure Warranty without reasonable justification; (ii) deny Plaintiff's rights under the Leisure Warranty and (iii) oppress, frustrate and harm Plaintiff.

66. Defendants were timely notified of their breach of warranty by the Plaintiff and given the opportunity to honor their Leisure Warranty.

67. To date, Defendants have failed to and refused to honor their Leisure Warranty.

68. As a direct and proximate result of Defendants breach of its written limited warranty, Plaintiff has been damaged in the amount of $62,903.47, which was the cost to repair the Volvo products which would have otherwise been covered by the Leisure Warranty, and has sustained consequential damages, incidental damages, and has been required to hire the undersigned law firm and pay the attorney's fees and costs to prosecute its claims against the Defendants.

69. Under the MMWA, Plaintiff is entitled to an award its damages, consequential damages, incidental damages, pre-judgement interest and attorney's fees and costs against the Defendants.

## COUNT II
## BREACH OF WARRANTY
(Reclassification from Leisure to Commercial)

70. Plaintiff re-alleges paragraphs 1 through 42 above as if fully set forth herein.

71. The Leisure Warranty attached as Exhibit "A" is a valid and enforceable written warranty between Plaintiff and Defendants.

72. Defendants breached their warranty obligations to Plaintiff when they reclassified the Vessel to be covered by the Commercial Warranty rather than the Leisure Warranty with the intent and purpose to deny covering the S&S warranty work and any and all future work (including the SMS work) under the Leisure Warranty thereby denying Plaintiff's rights under the Leisure Warranty.

73. Defendants were timely notified of their breach of warranty by the Plaintiff and given the opportunity to honor their Leisure Warranty.

74. To date, Defendants have failed to and refused to honor their Leisure Warranty.

75. As a direct and proximate result of Defendants breach of its written limited warranty, Plaintiff has been damaged in the amount of $62,903.47, which was the cost to repair the Volvo products which would have otherwise been covered by the Leisure Warranty, and has sustained consequential damages, incidental damages, and has been required to hire the undersigned law firm and pay the attorney's fees and costs to prosecute its claims against the Defendants.

76. Plaintiff is entitled to an award its damages, consequential damages, incidental damages, pre-judgement interest and attorney's fees and costs against the Defendants.

77. Such breach led to Plaintiff's incurring damages of $62,903.47 to repair the Volvo products which would have otherwise been covered by the Leisure Warranty.

78. Plaintiff is entitled to an award its damages, consequential damages, incidental damages, pre-judgement interest and attorney's fees and costs against the Defendants.

**COUNT III**
**FRAUDULENT MISREPRESENTATION**
(Statements regarding applicability of Leisure Warranty v. Commercial Warranty)

79. Plaintiff re-alleges paragraphs 1 through 39 above as if fully set forth herein.

80. Throughout the parties' email communications concerning the dispute over the Leisure Warranty, it was clear to Plaintiff that Defendants were reviewing the matter at senior levels within the organization. Defendants stated in separate emails, "I will send this to our legal team and Warranty Director to make a final determination on the vessel's warranty" and "I have forwarded to our legal team for their review."

81. In reclassifying the Vessel and Volvo products to fall under the Commercial Warranty instead of the Leisure Warranty, Defendants stated,

> Volvo Penta has determined the Charter usage on your vessel falls under the terms of the Commercial Warranty Policy. Please note that the terms of the warranty including the definition of leisure and commercial use are prescribed by the warranty statement, and not any other definition including 'U.S. law'. The manufacture defines product usage with respect to warranty coverage. Your warranty policy is under commercial usage and is attached.

82. Each of these four statements is a fraudulent misrepresentation under Florida law. With each statement, (i) Defendants committed a false statement of a material fact (a misrepresentation); (ii) Defendants knew the representation was false, made it without knowledge as to either truth or falsity or made it under circumstances in which Defendants ought to have known, if they did not know, of the falsity thereof; (iii) Defendants intended that the misrepresentation would induce Plaintiff to act on it; and (iv) Plaintiff was injured acting in reliance on the

misrepresentation.

83. Each of these statements, both individually and taken as a whole, directly convey and indirectly indicate under the Leisure Warranty that Defendants alone are in a position to interpret the terms of the Leisure Warranty, that U.S. law does not apply (contrary to the express language of the Leisure Warranty, i.e., "It is in addition to any rights the Customer may have under applicable mandatory law."), that Defendants are the sole arbiter of any dispute concerning the Leisure Warranty and that whatever Defendants say is final.

84. These statements had the intended effect as demonstrated by Plaintiff's incredulous reply which reads,

> I can't imagine that Volvo is suggesting that the warranty is covered by "Volvo law". Utterly ridiculous. I can't imagine that any law other than U.S. law applies to a U.S. customer when not otherwise specified. Irrespective of that issue, the warranty language itself demonstrates that Volvo's latest interpretation is also incorrect. The warranty states, "This Warranty does not apply to products in commercial use, including, but not limited to . . . charter, e.g., paid crew, paying passenger . . . ." Those descriptive words, i.e., "paid crew, paying passenger" are used when describing crewed charters, passenger vessels or charters for hire which are commercial charters. They are not used to describe bareboat charters. So, by the warranty's own descriptive language, bareboat charters are excluded from the warranty's definition of both "charter" and "commercial use". The distinctions/descriptions/differences between bareboat charters and commercial charters are commonly held and well understood across legal jurisdictions and are well engrained in centuries of international admiralty law as reinforced by U.S. law. So under any governing law Volvo may argue that applies, other than "Volvo law", the warranty language itself acknowledges and reinforces the distinction between the two. Our bareboat charters are recreational use not commercial use under the express terms of the Warranty.
>
> I do not accept Volvo's determination of the Warranty coverage as it is simply incorrect. I appreciate that Volvo is continuing to work to solve the HCU and engine issues and I expect Volvo to continue to do so on an expedited basis.
>
> I will continue to insist that the work be covered by Volvo as it is Volvo's obligation under the warranty. Finally, when Volvo suggests that no law

governs the warranty other than Volvo's self-serving interpretation thereof, aka "Volvo law", it makes me question Volvo's judgement and motivations and gives the appearance of bad faith.  I hope that it is not the case.

85. In addition to stating beforehand that it was "a final determination on the vessel's warranty," Defendants reinforced that these fraudulent misrepresentations were the final disposition of the matter by never responding to Plaintiff's reply.

86. Defendants statements and subsequent conduct were intended to deny Plaintiff's rights under the Leisure Warranty and oppress Plaintiff by implying that Volvo, and Volvo alone, determines the meaning of its warranty policies and that its decisions were final and not subject to dispute, irrespective of U.S. law and any other mandatory law that may apply.

87. 16 C.F.R. § 700.8 states, "A warrantor shall not indicate in any written warranty or service contract either directly or indirectly that the decision of the warrantor, service contractor, or any designated third party is final or binding in any dispute concerning the warranty or service contract. Nor shall a warrantor or service contractor state that it alone shall determine what is a defect under the agreement. Such statements are deceptive since section 110(d) of the Act, 15 U.S.C. 2310(d), gives state and federal courts jurisdiction over suits for breach of warranty and service contract."

88. Each of the four statements is contrary to the express terms of the Leisure Warranty, violates the MMWA (see 15 U.S.C. 2310(d)) and are "deceptive" as a matter of law (see 16 C.F.R 700.8).

89. Each of these statements was intended to preclude Plaintiff from processing Plaintiff's warranty claims under the Leisure Warranty.  While Plaintiff objected to Defendants' determination, Plaintiff was forced by this determination to proceed with the engine and HCU repair work (both the S&S and SMS work) and pay for it out of pocket.  Plaintiff incurred

damages equal to $62,903.47 representing the actual costs to repair the Volvo products that would have otherwise been covered by the Leisure Warranty but for Defendants fraudulent misrepresentations.

90. At all times material hereto, Defendants drafted, adopted and issued the Leisure Warranty to specifically comply with the MMWA and U.S. law and Defendants, the legal team and the Warranty Director either knew or should have known that the Leisure Warranty was governed by U.S. law and the MMWA and that the use of both the Vessel and the Volvo products were governed by U.S. maritime law.

91. At all times material hereto, Defendants, the legal team and the Warranty Director knew or should have known that the Leisure Warranty was drafted expressly and purposely to allow leisure boat owners to enter into recreational bareboat charters and that such use would be deemed to be "leisure use" under the Leisure Warranty and U.S. law because (i) such use was for a "Customer's own personal use and recreation" as the Leisure Warranty states, (ii) "Customer" is defined as "the owner or end user of the Product" under the Leisure Warranty, and (iii) under U.S. maritime law, "'recreational vessel' means a vessel- (A) being manufactured or operated primarily for pleasure; or (B) leased, rented, or chartered to another for the latter's pleasure."  (See 46 U.S. Code § 2101(34)).

92. At all times material hereto, Defendants, the legal team and the Warranty Director purposefully, deliberately and deceptively misrepresented the terms and meanings of the Leisure Warranty with the specific intent to (i) avoid financial liability under the Leisure Warranty without reasonable justification; (ii) deny Plaintiff's rights under the Leisure Warranty and (iii)  oppress, frustrate and harm Plaintiff.

93. At all times material hereto, Defendants, the legal team and the Warranty Director

purposefully, deliberately and deceptively denied the applicability of U.S. law to the Leisure Warranty and to Plaintiff's rights thereunder to . i) avoid financial liability under the Leisure Warranty without reasonable justification; (ii) deny Plaintiff's rights under the Leisure Warranty and (iii) oppress, frustrate and harm Plaintiff.

94. As a result of the Defendants' aforementioned fraudulent conduct, Plaintiff has suffered damages, including, but not limited to $62,903.47 to repair the Volvo products which would have otherwise been covered by the Leisure Warranty, consequential damages, incidental damages, pre-judgment interest, attorney's fees and costs and any other damages available by law including punitive damages on proof of fraud.

95. Plaintiff is entitled to an award its damages, consequential damages, incidental damages, pre-judgement interest, attorney's fees and costs and punitive damages against the Defendants.

**COUNT IV**
**NEGLIGENT MISREPRESENTATION**
(Statements regarding applicability of Leisure Warranty v. Commercial Warranty)

96. Plaintiff re-alleges paragraphs 1 through 39 above as if fully set forth herein.

97. In denying Plaintiff's warranty claims under the Leisure Policy, Defendants stated,

> Volvo Penta has determined the Charter usage on your vessel falls under the terms of the Commercial Warranty Policy.  Please note that the terms of the warranty including the definition of leisure and commercial use are prescribed by the warranty statement, and not any other definition including 'U.S. law'. The manufacture defines product usage with respect to warranty coverage. Your warranty policy is under commercial usage and is attached.

98. Each of these four statements is a negligent misrepresentation under Florida law. With each statement, (i) Defendants made a misrepresentation of material fact that they believed to be true but which was in fact false; (ii) Defendants were negligent in making the statement because they should have known the statement was false; (iii) Defendants intended to induce Plaintiff to rely on the misrepresentation; and (iv) Plaintiff was injured acting in justifiable

reliance on the misrepresentation.

99. Each of these statements, both individually and taken as a whole, directly convey and indirectly indicate under the Leisure Warranty that Defendants alone are in a position to interpret the terms of the Leisure Warranty, that U.S. law does not apply (contrary to the express language of the Leisure Warranty, i.e., "It is in addition to any rights the Customer may have under applicable mandatory law."), that Defendants are the sole arbiter of any dispute concerning the Leisure Warranty and that whatever Defendants say is final.

100. 16 C.F.R. § 700.8 states, "A warrantor shall not indicate in any written warranty or service contract either directly or indirectly that the decision of the warrantor, service contractor, or any designated third party is final or binding in any dispute concerning the warranty or service contract. Nor shall a warrantor or service contractor state that it alone shall determine what is a defect under the agreement. Such statements are deceptive since section 110(d) of the Act, 15 U.S.C. 2310(d), gives state and federal courts jurisdiction over suits for breach of warranty and service contract."

101. Each of the four statements is contrary to the express terms of the Leisure Warranty, violates the MMWA (see 15 U.S.C. 2310(d)) and are "deceptive" as a matter of law (see 16 C.F.R 700.8).

102. Defendants were negligent in making these statements because they should have known that (i) these statements violated the MMWA's requirements, (ii) Plaintiff's bareboat charters were a "recreational use" of the Volvo products by design, by registration, by contract, by actual use and by law, and (iii) that each of the statements was directly contrary to the express terms and conditions of the Leisure Warranty.

103. Plaintiff was forced by these statements, and therefore justifiably relied on them, to proceed

with the engine and HCU repair work on its own and pay for such work out of pocket. The Vessel would have been stranded and inoperable otherwise. Plaintiff incurred damages equal to $62,903.47 representing the actual costs to repair the Volvo products that would have otherwise been covered by the Leisure Warranty but for Defendants negligent misrepresentations.

104.   As a direct and proximate result of the Defendants' aforementioned negligent misrepresentation, Plaintiff has suffered damages, including, but not limited to $62,903.47 to repair the Volvo products which would have otherwise been covered by the Leisure Warranty, consequential damages, incidental damages, pre-judgment interest and attorney's fees and costs.

105.   Plaintiff is entitled to an award its damages, consequential damages, incidental damages, pre-judgement interest and costs against the Defendants.

<u>**COUNT V**</u>
<u>**FRAUDULENT MISREPRESENTATION**</u>
(Statements regarding HCUs/DockMate)

106.   Plaintiff re-alleges paragraphs 1 through 39 above as if fully set forth herein.

107.   Volvo denied warranty coverage of the HCU reprogramming work by blaming the Dockmate as the cause of the problem. Volvo stated on October 31, 2024, "We found that the DockMate was/is causing the interference, not a Volvo Penta failure. Volvo Penta does not authorize DockMate products. Since Dock Mate is the cause, this is not considered a warrantable failure."

108.   Each of these three statements is a fraudulent misrepresentation under Florida law. With each statement, (i) Defendants committed a false statement of a material fact (a misrepresentation); (ii) Defendants knew the representation was false, made it without

knowledge as to either truth or falsity or made it under circumstances in which Defendants ought to have known, if they did not know, of the falsity thereof; (iii) Defendants intended that the misrepresentation would induce Plaintiff to act on it; and (iv) Plaintiff was injured acting in reliance on the misrepresentation.

109.    The first statement ("We found that the DockMate was/is causing the interference, not a Volvo Penta failure.") is false because it is directly contrary to what the Volvo Penta Authorized Dealer and Volvo Penta found while troubleshooting the HCUs and concurrently documenting their findings.

110.    On October 24, 2024, the Volvo Penta Authorized Dealer (S&S) noted, "It was determined by Volvo Penta that the HCUs required replacement."   "We removed power from the dock mate system thinking this could be affecting our programming. Reattempted with no success." "The cause of the programming issues while the components are installed is still unknown."

111.    The next day, on October 25, 2024, Plaintiff received the following email message from the Authorized Volvo Penta Dealer [emphasis added]:

> Just received an update from Volvo.
>
> The software from the mainframe that is to be uploaded into the HCU is currently not programmable *and corrupted on the Volvo Sweden side*. They are working to rectify the issue, however this might mean that we don't have the HCU's back in time for Monday morning. I will keep you posted as they fill me in with info.
>
> The good news is that the engine EMS was successfully programmed, *which confirms that the issues are isolated to the HCU's and the related software.*

112.    The initial report from the Authorized Volvo Penta Dealer on October 24, 2024 clearly states that the cause of the programming issues were "unknown".  However, the report also strongly suggests the DockMate was <u>not</u> the cause of the programming issues because when

the DockMate was disconnected it made no difference to the outcome of the programming.

113.    S&S's follow-up report the next day is even more compelling in that it confirms that the HCU software was "corrupted on the Volvo Sweden side" not by the DockMate and that "the issues are isolated to the HCU's and the related software."

114.    Therefore, Defendants' statement that "the Dockmate was/is causing the interference, not a Volvo Penta failure" is clearly and unequivocally false, based on Defendants' own internal work and concurrent communications and reports between the Authorized Volvo Penta Dealer and Volvo Penta.

115.    The second statement ("Volvo Penta does not authorize DockMate products.") is false. Defendants issued a Product Newsletter on December 19, 2019 entitled "Interface for Dockmate and Yachtcontroller".   The Product Newsletter explains that Volvo added two supplier codes in the EVC system – one specifically for Dockmate – and that Dockmate will be able to buy interfaces to the EVC system. The interfaces provide Dockmate with "access to shift and limited throttle and they work together with EVC E and EVC 2 upgraded to the latest software."  The Product Newsletter makes perfectly clear that Defendants created a method specifically for Dockmate products (as well as those of competing products) to connect to the Volvo Penta systems onboard the Vessel.  The Product Newsletter does not state anywhere that connecting a Dockmate as described in the Product Newsletter voids the warranty.

116.    While the Note at the end of the Product Statement states that Volvo has not "approved" the product (i.e., DockMate) and that Volvo "will not take any responsibility for the function of their product" (referring to Dockmate and Yachtcontroller), those statements only suggest that Volvo did not endorse any particular after-market product whether Dockmate, Yachtcontroller or Xenta (also mentioned in the Product Statement).   Consistent with that

interpretation, the disclaimer concludes by stating "We sell them an interface but can and will not take responsibility for the functioning of their product", again referring to both Dockmate and Yachtcontroller.

117.    Nowhere in the Product Statement, nor anywhere else for that matter, has Volvo disclaimed responsibility for the functioning of any Volvo Penta parts/software etc. when a Dockmate, Yachtcontroller or Xenta is connected to Volvo Penta's systems through the interface nor is there any statement that excludes liability under the warranty for defects or damage caused by Dockmate, Yachtcontroller or Xenta when connected through a Volvo Penta interface.  Thus, Defendants did in fact authorize DockMate to connect to Volvo Penta systems as proven by the release of the Product Newsletter as well as by Defendants thereafter continuously selling interfaces to DockMate for that specific purpose.

118.    The third statement ("Since Dock Mate is the cause, this is not considered a warrantable failure.") is false for the same reasons as the first statement.

119.    Under MMWA § 2310, "a warrantor cannot, as a matter of law, avoid liability under a written warranty where a defect is unrelated to the use by a consumer of 'unauthorized' articles or service."  16 CFR § 700.10(c).  "This does not preclude a warrantor from expressly excluding liability for defects or damage caused by 'unauthorized articles or service; nor does it preclude the warrantor from denying liability where the warrantor can demonstrate that the defect or damage was so caused."  See 16 CFR § 700.10(c).

120.    In the context of motor vehicle warranties, the FTC explained, "denying coverage with a bald, unsupported statement that the 'unauthorized' parts . . . caused the vehicle damage would be insufficient under the Commission's existing Interpretations.  Warrantor must have a basis for warranty denials by demonstrating to consumers that the use of unauthorized parts caused

the defect or damage to the vehicle." Fed Reg. Vol 80, No. 138, July 20, 2015, p. 42714.

121.     The Federal Trade Commission deems bald, unsupported denials of warranty coverage to be deceptive under 15 U.S.C. 2310.  (See 16 CFR § 700.10(c)).  Defendants have unabashedly foisted these very same deceptions on Plaintiff.

122.     Defendants cannot disclaim liability under the warranty because (i) Defendants have only made a "bald, unsupported statement" with no evidence that the DockMate was the cause of the programming failure;   (ii) to the contrary, all known evidence suggests that the programming defects were not in fact caused by the DockMate but were "isolated to the HCUs and the related software", and (iii) all three statements taken as a whole are per se "deceptive" under 16 CFR § 700.10(c).

123.     Defendants' conduct is even more egregious here because they actually authorized DockMate products to connect to Volvo Penta systems using an interface they sell to DockMate for that purpose and have not disclaimed liability for interference caused by a DockMate when connected to the interface.  Thus, even if the DockMate were the cause of the programming issues, Defendants would still be liable under the Leisure Warranty because they authorized the use of DockMate products with the Volvo products and sold an interface to Dockmate (and ultimate Plaintiff) for that specific purpose..

124.     Each of Defendants' statements was intended to deny Plaintiff from exercising Plaintiff's rights under the Leisure Warranty.  While Plaintiff objected to Defendants' determination, Plaintiff was forced by this "final determination" to proceed with the engine and HCU reprograming work and pay for it out of pocket.   This, coupled with Defendants' other fraudulent conduct noted above, oppressed and frustrated Plaintiff's ability to enforce its rights under the Leisure Warranty.

125.    As a result of the Defendants' aforementioned fraudulent conduct, Plaintiff has suffered

damages, including, but not limited to $62,903.47 to repair the Volvo products which would

have otherwise been covered by the Leisure Warranty, consequential damages, incidental

damages, pre-judgment interest, attorney's fees and costs and any other damages available by

law including punitive damages on proof of fraud.

126.    Plaintiff is entitled to an award its damages, consequential damages, incidental damages,

pre-judgement interest, attorney's fees and costs and punitive damages against the Defendants.

## AD DAMNUM

WHEREFORE, Plaintiff requests judgment as follows:

A.    Award actual damages for breach of the Leisure Warranty in the amount of $62,903.00,

award of consequential damages and award of incidental damages;

B.    Pre-judgment interest on all sums awarded to the Plaintiff;

C.    Award $500,000.00 to Plaintiff as punitive damages under Section 768.73(1)(a) Florida

Statutes (2025).

D.    Award $2,000,000.00 to Plaintiff as punitive damages under Section 768.73(1)(b) Florida

Statutes (2025) because the "legal team" and "Warranty Director" were responsible for the

wrongful conduct complained of herein in order to avoid financial liability under the

warranty without reasonable justification therefor and knowing that it would injure

Plaintiff;

E.    Award reasonable attorney fees and costs pursuant to Magnuson-Moss Warranty Act, 15

USC 2301 *et seq* and under the fraud allegations;

H.    Order a permanent injunction prohibiting Defendants from claiming in the future that the

Vessel and the Volvo products thereon are not covered by the Leisure Warranty based on

the Vessel's recreational bareboat charter usage or the installation and use of the DockMate; and

I.      Award costs and such other relief as may be just and proper.

### REQUEST FOR JURY TRIAL

Plaintiff hereby requests a trial by jury.

Respectfully Submitted,

**s/ Andrew N. Mescolotto**
ANDREW N. MESCOLOTTO (28141)
FERTIG AND GRAMLING
200 Southeast 13th Street
Fort Lauderdale, FL 33316
PH:     (954) 763-5020
FX:     (954) 763-5412
anm@fertig.com
Attorney for the Plaintiff

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on this 7th day of March 2025 on all counsel or parties of record via the Court's CM/ECF system.

Respectfully Submitted,

/s Andrew N. Mescolotto
Fertig & Gramling

### SERVICE LIST

| | |
|---|---|
| ANDREW N. MESCOLOTTO (28141)<br>FERTIG AND GRAMLING<br>200 Southeast 13th Street<br>Fort Lauderdale, FL 33316<br>PH:     (954) 763-5020<br>FX:     (954) 763-5412<br>anm@fertig.com<br>Attorneys for the Plaintiff<br>*VIA CM/ECF* | |